[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
The plaintiff, Robert Cohen, began this action on October 30, 1990, by causing the complaint to be served on the three defendants, Daniel Beharry, Dennis Cavanaugh, and Brian Woolf. Prior to January 1, 1989, the plaintiff and the three defendants were partners in a law firm known as Cohen, Channin, and Woolf, located at 363 Main Street, Hartford. On April 26, 1993, the action against Woolf was withdrawn after he filed a bankruptcy CT Page 5384 petition in the United States Bankruptcy Court for Connecticut on June 6, 1991.
The trial of the case began on October 11, 1995, and was not concluded until April 30, 1999. There were approximately eighty days of trial scattered over a period of nearly four years. The trial was suspended on many occasions because of conflicting obligations of the court, the parties, or trial counsel. Briefs were filed on September 15, 1999, and reply briefs were filed on September 30, 1999.
 I. History
In April, 1983, the plaintiff established the law firm of Cohen Channin as a sole proprietorship. Jacob Channin had previously been associated with Cohen, but he had no ownership interest in the law firm established in 1983. At that time he was semi-retired from the practice of law and lived on Long Island, New York. He was "of counsel" to the new proprietorship and, when requested by Cohen, would drive to Hartford to review and evaluate certain files. Cohen paid him for the services he performed.
At the outset of his sole proprietor ship, Cohen employed two attorneys, Earl Phillips and Dennis Cavanaugh, as associates. On June 1, 1985, Cohen, Phillips and Cavanaugh formed a partnership to take over the business of the sole proprietorship, which was then terminated. Cohen contributed the accounts receivable, furniture, dictating equipment, computers, and copy machines to the new partnership, which continued to use the name, Cohen and Channin until it was changed later to Cohen, Channin and Phillips.
According to an accounting report (Ex. 2) for the first seven months of operation of the new partnership, June 1, 1985 to December 31, 1985, the property transferred to the new partnership by Cohen had a value of $341,430 on June 1, 1985, when the transfer was made. The three partners agreed, however, that the financial records of the partnership would treat the contribution as the basis for creating capital accounts of $61,756 for Phillips, $29,501 for Cavanaugh, and $221,625 for Cohen. In the event that Phillips or Cavanaugh should leave the partnership, it was agreed that his capital account would be reduced by the amount thereof created from Cohen's contribution.
The partners also agreed that profits and losses would be shared among them according to their "units of participation" and would not be based on their respective capital accounts. A total CT Page 5385 of 136 units were created of which 66 (48.5%) were allotted to Cohen, 38 (27.9%) to Phillips, and 32 (23.5%) to Cavanaugh. The net income of the partnership was to be shared according to the units of participation held by each partner, except that an additional percentage of the fees received would be given to the partner who originated the business.
The partnership used the cash method of accounting in preparing its tax returns. It also kept a record of such accrual items as accounts receivable and "work in process." Financial statements prepared by its accountants ordinarily included those accrual items as well as cash, office equipment, furniture and other tangible assets.
On September 4, 1995, Phillips resigned from the firm to take a position as head of the environmental department of Robinson 
Cole, another Hartford law firm. He took with him some clients of his former partnership when he moved to Robinson Cole. Cohen consented to Phillips' retention of the automobile that had been provided for him by the firm, a 1987 Saab. Phillips made no claim to any portion of his capital account, which would have been reduced by $29,501, the amount credited to his capital account from Cohen's contribution to the partnership, pursuant to the agreement among the partners when they formed the partnership. After his departure, Phillips never claimed a share of the funds collected on accounts receivable, contingent cases, or resulting from work in progress not billed until after he had resigned. The name of the partnership, then composed of only Cohen and Cavanaugh, reverted to Cohen and Channin.
On December 7, 1987, the defendant Beharry began his employment as an associate of the firm of Cohen and Channin. On that date, the firm owed Connecticut National Bank $110,037.00 on a promissory note (the 1987 note). On December 31, 1987, the firm borrowed an additional $75,000 from Connecticut National Bank on a promissory note (the 1988 note) for the purpose of prepaying some 1988 calendar year expenses such as rent, insurance, and other costs of operation. Cohen and Cavanaugh, the only partners at that time, endorsed the two notes. The notes did not specify the amount for which each partner would be liable in the event of default, but did create a joint and several obligation. (Ex. 15a)
On January 1, 1988, Beharry became a partner in the firm of Cohen and Channin. At that time, he endorsed the 1987 and 1988 notes that had previously been signed by the other partners, Cohen and Cavanaugh. The total debt of the firm on both notes for which CT Page 5386 Beharry became jointly liable on January 1, 1988, was $183,237.
In July, 1989, the defendant Woolf became a partner in the firm, which then changed its name to Cohen, Channin and Woolf. The firm provided him with a luxury car, expense accounts, and a large draw. The firm borrowed additional amounts on the 1987 and 1988 notes to Connecticut National Bank to pay those expenses. On March 8, 1990, Cohen learned that Woolf had attempted to hire some employees of the firm for a new enterprise that he intended to establish. After consulting outside counsel and the accountants for the firm, Cohen informed Woolf that he was no longer a member of the partnership. At the time his partnership terminated, Woolf's capital account showed a deficit of $140,469 and he had accumulated bills chargeable to the partnership of more than $20,000.
On December 4, 1989, Beharry informed the other partners of his intention to withdraw from the partnership, leaving the effective date to be determined later. About December 11, 1989, Cohen, who had replaced Beharry as the managing partner, requested that Beharry make his withdrawal effective on December 15, 1989. Beharry agreed, but arranged with Cohen to continue to use the partnership office and facilities to conduct his own practice until he could relocate. In return, Beharry paid the salary and benefit costs of a secretary and an associate who did work for him. He also paid 25% of the rent and utility charges incurred by the partnership. Because the accounting reports and other financial documents are based on the year ending December 31, 1989, he has agreed to use that date in determining his partnership interest.
On March 16, 1990, Cavanaugh resigned from the partnership and accepted a position with Halloran and Sage, another Hartford law firm. Without consulting Beharry, he and Cohen executed a written agreement (Ex. 7a) on March 30, 1990, regarding the transfer of certain files after the client notified Cohen in writing that the client wanted Cavanaugh to represent him thereafter. On the date that Cavanaugh terminated his partnership with Cohen, the balance owed on the 1987 note was $135,000 and the balance on the 1988 note was $75,000, a total of $310,000 on both notes. Ultimately, $66,925.27 was paid to Cohen by Cavanaugh pursuant to the transfer agreement and that amount was applied to reduce the bank debt for which Cohen, Cavanaugh and Beharry were obligated.
After March 16, 1990, Cohen continued to practice law as a sole proprietor, using the trade name, Cohen Channin. He retained possession of the business records of the former CT Page 5387 partnerships and the case files, except for those transferred to Cavanaugh. He proposed the appointment of a receiver for the old firms to Beharry and Cavanaugh, but they objected. When he brought this action, however, he did not include the appointment of a receiver in his prayer for relief. In effect, he became the winding-up partner pursuant to General Statutes § 34-75 of the Uniform Partnership Act, which was repealed effective July 1, 1997. The repeal of that statute does not affect the rights of the parties in this litigation, because those rights were determined at the time the partnerships terminated, when the statute remained in effect.
 II. Rights to A/R and WIP after dissolution
The parties dispute the right of a partner who has left the firm to share in the payments received after his departure for fees and expenses relating to services performed and billed before he left the firm, i.e., accounts receivable (A/R). They also disagree about payments received on bills rendered after the departure of a partner that pertain to services performed and expenses incurred both before and after his departure, referred to by the parties as "work in progress" or WIP. The plaintiff maintains that the defendants are not entitled to share in the payments received after their departure for either accounts receivable (A/R) or for work in progress (WIP), whether all or part of the work was performed prior to the departure of the partner. He relies on the testimony of a law professor at trial and also on a passage from a treatise on partnership law, II Bromberg Ribstein on Partnership, § (708(e)(1) (1988 supp. 1999) "If an incoming partner shares in receivables and work in progress only by paying for them, an outgoing partner should be paid for them. If the incoming partner shares in the fees without paying for them, however, outgoing partners should not be paid for them."
Such a rule, referred to in the plaintiff's brief as the "default rule," would operate quite unfairly if the A/R and WIP, at the time a partner withdrew from a firm, greatly exceeded the share of those accrual items shown on the partnership books from which he may have benefitted [benefited] when he became a partner. At the time Beharry left the partnership, December 31, 1989, the balance sheet (Ex. 14, p. 3) prepared by the firm's accountants indicates A/R of $313,609 and WIP of $255,341, a total of $568,950 after allowing for doubtful accounts. The balance sheet for the year ending December 31, 1987, (Ex. 3, p. 4), just before Beharry became a partner, indicates "fee income receivables" of $459,709, consisting of CT Page 5388 "billed, unbilled, and contingent" fee income, after allowing for "uncollectible accounts." These figures indicate that the fund in which Beharry may have shared when he became a partner in 1987 was $109,241 less than the fund in which he was entitled to share at the time he ceased to be a partner.
It is not clear whether this "default" rule can be applied to the defendants Cavanaugh and Beharry, both of whom endorsed the bank notes reflecting the indebtedness of the partnership soon after they became partners, thus assuming joint and several liability for that debt. Payments of principal and interest to the bank while they remained partners decreased their shares of partnership income as well as that of Cohen. Their endorsements may properly be treated as contributions to the capital of the firm to the extent of their contributions in payment of the notes.
Another difficulty in applying the "default" rule in this case is that the evidence is insufficient to prove that either Cavanaugh or Beharry, after they became partners, shared in fees or expenses relating to work performed before that time, let alone the amount thereof paid to each of them. The only case cited in support of the default rule by Bromberg and Ribstein is Bailey and Williams v. Westfall, 727 S.W.2d 86 (Tex.App.-Dallas 1987). In that case, however, the decision that the partner was not entitled to a share of the accounts receivable of the firm after his withdrawal was based on a written partnership agreement so providing. "The arbitrator's award ignores accounts receivable only because the parties agreed that they should be ignored in determining the amount due withdrawing partners." Id. The court reaffirmed its decision in Bader v. Cox, 701 S.W.2d 677 (Tex.App.-Dallas (1985), in which it held that "under the Texas Uniform Partnership Act, absent a partnership agreement, the widow of a deceased partner was entitled to her husband's share of his law firm's accounts receivable at his death, even though the firm utilized a cash basis accounting system." Id., 90. The Bader court rejected a claim that the case files were not assets of the partnership because the law firm operated on a cash basis accounting system. "The fact that fees are not earned until a case is concluded by settlement or judgment does not compel the conclusion that the files lose their character as partnership assets." Bader v. Cox, supra, 822. In Seale v. Sledge, 430 So.2d 1028 (La.Ct. of App., writ refused, 437 So.2d 1155 19__), the Court of Appeals of Louisiana concluded that "former partners had an interest in a contingent fee received in settlement of a personal injury suit . . . despite the fact that the firm maintained its accounts on a cash basis." Id. "[C]ourts confronted with the dissolution of a CT Page 5389 law partnership have held that pending cases are uncompleted transactions requiring winding up after dissolution, and are therefore assets of the partnership subject to post dissolution distribution." Beckman v. Farmer, 579 A.2d 618, 636 (D.C.App. 1990).
This court is aware of only one reported Connecticut decision involving the right of a former partner to share in fees received by the partnership after dissolution for work done before dissolution, the case of Messina v. Colandro, 214 Conn. 596, ___ A.2d ___ (1990). In that case, which pertained to the dissolution of a real estate development partnership, the court declared: "Thus, just as an attorney, after dissolution of a law partnership, has the right to his share of fees received from a case that was brought into the partnership prior to its dissolution, the plaintiff in this case has a right to his share of the profits as contemplated by the partnership agreement." Id., 600-01 (1990). In August v. Moran, 50 Conn. App. 202, 208, ___ A.2d ___ (1998) the court stated that a determination of a former partner's capital account was not equivalent to "an accounting of his partnership interest, of which the value of his capital account is but one component." In a footnote, the opinion, with apparent approval, refers to the affidavit of a certified public accountant stating that "a formal accounting consists of (1) cash balances, (2) fixed assets, (3) security deposits, (4) other assets, (5) notes payable, (6) accounts receivable, (7) accounts payable, (8) work in progress, (9) other accrued expenses, and (10) capital accounts." Id., 202 n. 6.
Early in the trial of this case the court informed counsel that it was inclined to rule that fees and expenses received after dissolution of a partnership should be allocated among the partners in proportion to the value of the services performed and expenses incurred before and after the dissolution. After hearing the evidence and reading the briefs, the court has concluded that its initial view was correct and that the apportionment should be made according to the value of the services and expenses before and after dissolution. Fortunately, it was the practice of the firm to maintain records of the time and expenses relating to each case handled by the firm, and Cohen continued this practice after dissolution. Both the plaintiffs and the defendants have presented exhibits reflecting the results of their analyses of the partner ship records that purport to comply with that formula, although Cohen continues to adhere to his view that neither Beharry nor Cavanaugh is entitled to share in payments received on accounts receivable or work in progress after termination of their CT Page 5390 partnerships.
 III. Cohen's Accounts at Trial
The first account presented by Cohen as the winding up partner, which he submitted in evidence on October 11, 1995, is a financial statement prepared by the firm's accountants, Deloitte and Touche, for the partnership that terminated on 12/31/89, the effective date of Beharry's withdrawal. (Ex. 17) This statement contains a balance sheet that includes as assets of that partnership $313,609 of accounts receivable (net of allowance for doubtful accounts of $34,845) and $255,341 of WIP or services not billed (net of allowance for doubtful accounts of $9,550). (Ex. 17, p. 3) The statement also shows that Beharry had a negative capital account of $29,355 by virtue of having withdrawn that amount in excess of his starting capital on January 1, 1989, plus his net partnership income for 1989. (Ex. 17, p. 15) Brian Woolf had also overdrawn his partnership income for 1989, resulting in a negative capital account of $69,625 for him. (Ex. 17, p. 5)
Cohen presented a second account for the partnership captioned "corrected revised accounting for the law partnership as of 12/31/89." (Ex. 20) This document was admitted into evidence on July 11, 1996, and it followed the same balance sheet format as the first account prepared by the firm's accountants. It included as partnership assets "A/R 12/31/89 reduced to cash of $255,490.69" and "WIP 12/31/89 reduced to cash of $116,640.18." These figures were taken from the firm's business records of A/R (Ex. EE) and WIP (Ex. FF)
On July 25, 1996, Cohen presented in evidence a third account (Ex. 30) for the 12/31/89 partnership, which included as partnership assets "A/R 12/31/89 reduced to cash (plus $41,500 American-less refund of $894.18 to Risdon) of $296,096.51," an increase of $40,605.82 over the amount of A/R shown on Ex. 20, and WIP reduced to cash of $116,640.18, the same amount shown on Exhibit 20.
On April 22, 1998, Cohen offered a fourth account that was admitted in evidence (Ex. 121), titled "Cash Accounting by Robert B. Cohen Partnership as of 12/31/89 reflecting AR and WIP Collected and Cost of producing Revenue." This account includes A/R reduced to cash of $255,490, a decrease of $40,606.15 from the amount shown for that item in Ex. 30, and $116,640 of WIP reduced to cash, the same amount shown on exhibit 20 for that item. It also includes some additional payments received which bring the total assets to CT Page 5391 $434,906. It shows "Partnership Liabilities Paid" of $1,376,756, consisting of "trade payables", additional expenses paid after 12/31/89 not included in "trade payables," bank debt payments of principal and interest, and various other expenses incurred by Cohen after 12/31/89 claimed to be related to the partnership dissolution. Subtracting the assets from the liabilities results in a shortage of $941,840, indicating that the partnership was insolvent.
Cohen introduced in evidence four additional accounts, exhibits 127, 138, 139, and 140, each being a revision of a preceding account. Exhibits 139 and 140 were admitted in evidence on January 13, 1999. The significant feature of the eight accounts introduced at trial is that all of them credit the 12/31/89 partnership, in which Cohen, Cavanaugh and Beharry all share, with the payments received on A/R and WIP after termination of that partnership. It was not until February 26, 1999, when Stephen Utz, a law professor, testified, that Cohen first took the position that neither Cavanaugh nor Beharry was entitled to share in those assets of the partnership because of the Ribstein proposition. Utz testified once again in support of that proposition on April 30, 1999, the last day of trial.
This court is not persuaded that the Ribstein proposition is sound without some modification allowing departing partners to be compensated for A/R and WIP that exceeds the amount of those items on the partnership books at the time they became partners and in which they shared. The court also doubts its applicability when incoming partners are required to assume a substantial share of the preexisting debt of the firm, as Beharry and Cavanaugh did when they formed the partnership with Cohen.
 IV. Cohen's Post-trial Brief Account
In his post trial brief (pp. 16-17), Cohen effectively abandons the prior accounts he has submitted in evidence and presents a calculation of the value of Beharry's capital account deficit as of 12/31/89 which indicates that he owed the partnership $60,783.29 at the termination of his partnership. This calculation gives no credit to Beharry for payments of A/R and WIP on the books of the firm on 12/31/89 but received thereafter. It also includes a charge of $15,339.45 as his share of Woolf's capital account deficit on 3/16/90 when Woolf terminated his partnership with Cohen and Cavanaugh. When Beharry withdrew as a partner on 12/31/89, Woolf's capital account deficit was $69,625. (Ex. 17, p. 5) When Woolf left the partnership of Cohen, Cavanaugh and Woolf on CT Page 5392 3/16/90, his capital account deficit had increased to $143,407. (Ex. 6, p. 4) Beharry, however, would not be liable for any part of that increase because he was not a partner while it was taking place. His liability is limited to his share of Woolf's deficit that had accrued by 12/31/89, the date his partnership terminated. On that date, Woolf's capital account deficit was $69,625, and Beharry's 23% share would be $16,013.75
 V. Beharry's Account at Trial
The defendant Beharry has submitted in evidence an account, Exhibit XXXXX (Ex. X-5) for the 12/31/89 firm that is a revision of Exhibit 30, Cohen's original accounting for the firm that he belatedly abandoned when he learned of the Ribstein proposition on which he now relies. Exhibit X-5 lists the assets of the firm as follows:
Assets: Source:
1. Cash on Hand $8804.00 Ex. 17, p. 3 2. Prepaid Expenses 8866.00 Ex. 17, p. 3 3. A/R Red. to Cash 347,536.25 Exs. EE, II, XX, YY, L-5 4. WIP Red. to Cash 135,980.13 Exs. FF, II, XX, YY, N-5 5. Allocation 120,665.68 Exs. EE, FF, II, XX, YY, M-5 Worksheets and financial folders 6. DCC escrow 40,520.73 Exs. FF, KK, XXXX, U-5 7. Prop. Equip. 175,700.00 Ex. K 8. Automobiles 56,000.00 Beharry's personal knowledge
Total Assets $894,072.79
There is no dispute about item #1, cash, which was taken from the Deloitte Touche financial statements for the year ended December 31, 1989, Exhibit 17, p. 3. Cohen failed to include item #2, prepaid expenses, as an asset of the 12/31/89 firm in his Exhibit 30 or any of his later accounts, despite its inclusion in Exhibit 17, p. 3, the balance sheet for the firm on 12/31/89 prepared by its accountants. As Beharry points out, the 12/31/89 firm received no benefit from the payment of the prepaid expenses, but the successor firms received the entire benefit. Accordingly, the court concludes that those prepaid expenses should be treated as an asset of the 12/31/89 firm just as the firm's accountants treated them.
Many trial days were consumed in ferreting out the information concerning payments of items #3 (A/R) and #4 (WIP) CT Page 5393 received by the firm after 12/31/89, which are the basis for Beharry's revision in Ex. X-5 of the payments of A/R and WIP shown on Cohen's Exhibit 30. The mingling of payments due the 12/31/89 firm with those due the successor firms made it extremely difficult to determine which firm should be credited with a particular payment received. Rule 1.15 of the Rules of Professional Conduct requires that funds received by a lawyer in connection with a representation be kept separate from the lawyer's own property. As the winding-up partner, Cohen should have established a separate depositary and maintained separate records for the payments received in which the 12/31/89 firm had an interest. The court is persuaded that Beharry's revision of Exhibit 30, increasing the payments of A/R received by $51,439.74 and payments of WIP received by $19,340.13, as shown on Exhibit X-5, is reliable, subject to some revisions thereof by the court.
Item #5 (Allocation Worksheets), which increases the assets of the 12/31/89 firm by $120,665.68, is taken from Exhibit M-5, a summary of the work sheets allocating payments received in cases pending on that date that were not settled or otherwise disposed of until some time thereafter. The basis for the allocation is the time spent and the expense incurred by the 12/31/89 firm as compared to the successor firm or firms. One of the payments included in Exhibit M-5, for which Beharry has allocated $32,452.38 to the 12/31/89 firm, is the sum of $130,614.27 received from Warner Lambert during the period 8/14/90 to 2/28/92 for services performed. It is not claimed that either the 12/31/89 firm or the 3/16/90 firm did any of the work for which that payment was made. The only justification advanced for allocating part of that payment to the 12/31/89 firm is that the firm had spent substantial amounts of time in making a presentation to Warner Lambert for the purpose of representing that company in some environmental matters but was unsuccessful. The time spent on that project was not billable and no bill for the work involved was ever sent to Warner Lambert. Beharry and Cavanaugh had been introduced to the Warner Lambert representatives by Cohen as two of the lawyers who would be handling the work for that company. After Cavanaugh withdrew from the 3/16/90 firm, he sent a letter to Warner Lambert informing it of his new association with Halloran and Sage. That letter would not have been helpful to Cohen in securing that company as a client. It would be speculative to conclude that the presentation made to Warner Lambert by the 12/31/89 firm was of any significance in generating the relationship that later developed between that company and Cohen that resulted in the payment received. Without the Warner Lambert payment, which was the basis for a $32,452.38 credit to the 12/31/89 firm as shown on Exhibit M-5, the total CT Page 5394 addition to Exhibit 30 assets would be $85,564.50. That addition to the total assets of $421,540.69 shown on Exhibit 30 increases the total assets of the 12/31/89 firm to $507,105.19.
Another omission from the partnership assets that Cohen includes on Exhibit 30 is the value of the furniture, fixtures and equipment used by the 12/31/89 firm and the 3/16/90 firm that Cohen continued to use as a sole proprietor after 3/16/90. Cohen testified that much of the office equipment was obsolete. The city of Hartford, however, placed an assessed value of $123,000 on the firm's FEE, which represented seventy percent of its market value of $175,000, according to the testimony. The accountants' report for the 12/31/89 firm indicates values of $205,782 for furniture and fixtures and $36,380 for equipment, a total of $242,162 before depreciation and amortization. (Exhibit 17, p. 7) The report, however, does not state the amount of depreciation or amortization that should be deducted. (Id.) In the absence of other evidence, the court will accept the Hartford assessment valuation of $175,000 as reliable.
Cohen's Exhibit 30 also omits any valuation for the automobiles owned by the partnership, which were assigned to each of the partners for personal as well as business use. There was an oral agreement among the three partners that the firm would contribute toward the purchase of a new car by each of the partners. The amount of the firm's contribution was based on the partner's percentage interest in the firm at the time of purchase and the amount last contributed toward the car used by Cohen, who had the largest percentage interest. The accountants' report for 12/31/89 placed a valuation of $75,762 on the automobiles. (Exhibit 17) The titles to the automobiles indicated that the 12/31/89 firm owned each vehicle and the firm paid the expenses. Cohen's car, a Mercedes, was purchased in July, 1989, for 35,000. Cohen traded in another Mercedes held in his own name for which the dealer credited $18,000 against the purchase price of the new Mercedes. (Exhibit O-6) Cohen paid the balance of a bank note for $16,000 secured by the car from his personal funds. Beharry proposes in his post trial brief that the Mitsubishi, valued at $6,000, which he has used since he left the firm, be treated as a property distribution. Cavanaugh accepts a value of $20,000 as a property distribution in his accounting, Exhibit J-6, for the Audi purchased by the firm in 1988 for his benefit and which he has retained. Since Cohen apparently has paid a total of $34,000 for his Mercedes, which Beharry, in his post-trial brief, values at only $30,000 as of 12/31/89, there is no basis for charging Cohen with any amount as a property distribution because of his acquisition of the CT Page 5395 Mercedes. There is no evidence that the 12/31/89 firm paid any part of the purchase price of Cohen's Mercedes.
 VI. Beharry's Post-Trial Brief Account
In his post-trial brief, Beharry revised some of the figures contained in his account (Exhibit X-5) which was admitted in evidence at trial. Those revisions of the assets (Beharry's Revised Accounting) are as follows:
Cohen's Accounting Exhibit X-5 Beharry's Brief Source
A/R $296,096.51 $347,536.25 $350,452.45 Ex. EE, II, XX and YY Credit Balances ---------- $(2,577.43) Ex. EE
The "credit balances" item represents the balance of fees paid by clients before the legal services contracted for were completed. It is the portion of those fees that was not earned on 12/31/89. Unless that portion was earned later by the successor firms, it is an amount that should be refunded to the clients. It is not an asset of the 12/31/89 firm but a liability, as the parentheses indicate.
 VII. The Court's Accounting for the 12/31/89 Assets
Relying mainly on Beharry's Exhibit X-5 as revised in his post-trial brief, with the modifications previously discussed, the court's accounting of the assets is as follows:
12/31/89 Partnership Assets
 Cash $ 8,804.00 Ex. 17 Prepaid Exp. $ 8,866.00 Ex. 17 A/R Red. to $350,452.45 Exs. EE, II, XX, and YY Cash WIP Red. to $135,980.13 Exs. EE, II, XX Cash Allocation $ 85,564.50 See discussion on p. 9 Worksheets of this opinion DCC Escrow $ 41,300.00 xs. FF, KK, XXXX Prop. Equip $175,700.00 Ex. K Total Assets $806,577.05
 VII. Liabilities of 12/31/89 Partnership CT Page 5396
In Exhibit X-5, Beharry lists the 12/31/89 partnership liabilities claimed by Cohen in Exhibit 30 and Beharry's revision of some of them as follows:
12/31/89 Partnership Liabilities:
 Cohen's Beharry's Revision Amt. Accounting (Ex. 30) Accounting (Ex. X-5)
 1. Accounts $ 72,765.00 $ 72,765.00 -------- Payable
 2. Add'l $ 36,380.00 $ 36,380.00 -------- Expenses
 3. Expense Adjustments -------- $(21,628.76) $( 21,628.76) Ex. 5, 25, 32
 4. Add'l Pay $ 368.00 $ 368.00 -------- Roll Tax
 5. Bank Debt $345,000.00 $342,889.00 $( 2,111.00) Ex. 17
 6. Interest $ 67,628.00 $ 7,222.06 $( 60,405.94) Ex. II, EE and FF
 7. Acct's $ 18,608.00 $ 7,000.00 $( 11,608.00) Fees Ex. AA, 25, 5, T5
 8. Atty's $ 9,691.75 $ -------- $( 9,691.75) fees Ex. 5
 Total $550,440.75 $444,995.30 $(105,445.45) Liabilities
In Beharry's revised accounting included in his post trial brief, he has made the following revisions to the listing of liabilities in exhibit X-5:
 3. Expense Adjustments $(23,421.91) $(23,421.91)
 5. Bank $345,000 $296,158.00 $ (48,842.00) Debt CT Page 5397
 Total $550,440.75 $396,471.15 $(153,969.60) Liabilities
Item #3 (Expense Adjustments) in Beharry's revised accounting seeks a reduction of $23,421.91 in Item #2 of Cohen's accounting, which claims $36,380.00 of additional expenses paid after 12/31/89 by the successor firms, the 3/16/90 firm or Cohen's sole proprietorship after that date. Those additional expenses are shown on Exhibit 32, titled "Paid Expenses Not Shown on 12/31/89 Accounts Payable." While Beharry does not object to the inclusion of the accounts payable of $72,765, shown on Exhibit 25, as a liability of the 12/31/89 partnership, he does question those shown on Exhibit 32 because they were not included in Exhibit 17, the year end report of the accountants. Cohen blames Beharry, who was the managing partner of the firm until he withdrew from the partnership, for this over-sight.
Beharry acknowledges that most of the belatedly discovered bills listed on Exhibit 32 were properly charged to the 12/31/89 firm, but claims adjustments with respect to four items:
(1) Cunningham Group $5,235.25
Exhibit 25, p. 2, shows a payment of $3564.15 on 1/30/90 to Cunningham Reporting Associates which is included in the $72,765 of accounts payable shown on Exhibit 17 that Beharry does not dispute. The remainder of the $5235.25 is based on two checks listed on Exhibit 32, #2349 and #2350, one for $490.65 and the other for $1180.45, photo-copies of which are contained in Exhibit 5. Exhibit 5 also contains photo-copies of the invoices for these payments which indicate that the original invoices were submitted for payment between 6/30/89 and 10/23/89. The photo-copies also indicate the names of the cases in which the reporting services were rendered. The total of these payments is $5,235.25, as Cohen claims, and there is no basis for Beharry's claim for a reduction of $1,084.82 in his post-trial brief.
(2) Tax Collector, City of Hartford $9,576.72
Exhibit 32 lists the following payments to the Tax Collector of the City of Hartford for personal property taxes:
1/18/90 #1698 Tax Collector, City of Hartford 1988 $3,038.27 4/30/90 #2060 " " " " " 1988 1,793.15 7/20/90 #2409 " " " " " 1989 1,057.71 CT Page 5398 10/22/90 #2664 " " " " " 1989 1,057.71 1/29/91 #2887 " " " " " 1989 1,314.94 4/23/91 #3063 " " " " " 1989 1,314.94
Total $9,576.72
Beharry contends that his interest in the 12/31/89 partnership ought not to be charged for any tax payments made after the demise of the partnership on that date. He maintains that during his two years as a partner in that firm, 1988-89, he was required to contribute toward payment of the personal property taxes on the 1986 and 1987 tax lists. If the 12/31/89 firm is charged for the payments made in 1990 of the personal property taxes on the 1988 and 1999 lists, Beharry will have contributed toward the payment of personal property taxes for three and one-half years during his two year partnership.
It is clear that all of the taxes assessed against the 12/31/89 firm for 1987 and 1988 were debts of that firm that had not been paid on the date of its dissolution, 12/31/89. Section 34-78 (b) of the Uniform Partnership Act provides: "The liabilities of the partnership shall rank in order of payment as follows: (I) those owing to creditors other than partners, (II) those owing to partners other than for capital and profits, (III) those owing to partners in respect of capital, (IV) those owing to partners in respect of profits."
Subsection (d) of section 34-78 provides in part: "Except as provided in subsection (2) of section 34-53 (registered limited liability partnership), the partners shall contribute. . . . the amount necessary to satisfy the liabilities;. . . .
Because the unpaid personal property taxes were a liability of the 12/31/89 partnership, Cohen, as the winding-up partner, properly paid them from the assets of that firm when he discovered them in January, 1990. Whether Beharry should have been required to contribute toward the personal property taxes assessed against the preceding partnership of Cohen and Cavanaugh on the lists of 1986 and 1987 after he became a partner on January 1, 1988 is not an issue involved in this litigation. He is presumed to have realized, when he became a partner, that he was acquiring a share of the firm's liabilities as well as its assets. As managing partner, he must have been aware of those unpaid tax bills, but he never disputed his obligation to pay his share of them until after this litigation arose, so far as the evidence discloses. Accordingly, the court perceives no basis for making the adjustment CT Page 5399 claimed with respect to the Hartford personal property tax payments made by Cohen in 1990 in the total sum of $9576.72.
Real Property Taxes Pass-through: $3,900.20
Included in the expenses listed on Exhibit 32 (Paid Expenses Not Shown On 12/31/89 Accounts Payable) is the following entry:
 09/18/90 Check No. 0043 Hartford Development Group-1989 Pass-thru $3,900.20
On November 16, 1983, Cohen signed a lease, Exhibit 107, with the landlord, McKone Building Limited Partnership, for approximately 4,340 square feet of space on the fourth floor of the McKone building at 363 Main Street, Hartford, with a term commencing December 1, 1983, and ending January 31, 1988, "unless earlier terminated or extended." The lease gave the tenant an option to renew for an additional three years provided that written notice of the exercise of the option is delivered to the landlord at least 180 days before the end of the original term. The lease also provided that during the second year of the term and each year thereafter, in addition to the basic rent, each month, one twelfth of any amount by which real property taxes payable by the landlord to the City of Hartford during such year, attributable to the demised premises, (i.e. 25% of total building area) exceed the amount so payable during the first year of the lease term by reason of mill rate increase or citywide revaluation.
Cohen testified that he exercised the three year option. The report of the accountant's for the year ended 1989 states: "At the end of the original lease term, the Partnership exercised their three-year option to extend the lease through January 1991 at a monthly base rent of $6510. . . . Rent expense for the year ended December 31, 1989 was $78,120." (Exhibit 17, p. 9) As the managing partner during most of his two years as a partner of the 12/31/89 firm, Beharry must have been aware of the monthly rental payments of $6510 on the lease, $78,120 for the year, and must have realized that they were an obligation of the. firm. The tax pass-through provision was no less of an obligation. The court concludes that the $3,900.20 paid pursuant to the tax pass-through provision of the lease was properly included on Exhibit 32 as an account payable of the 12/31/89 partnership.
Accountant Fees $18,608
In Cohen's Accounting for the 12/31/89 firm, he claims to have CT Page 5400 paid $18,608 for accounting expenses related to that firm. At trial he submitted in evidence Exhibit AA, an assemblage of twenty-two bills dated January 30, 1989 to January 2, 1992, which were received from the firm's accountants. Deloitte Haskins Sells was the accounting firm responsible for the fourteen bills dated January 30, 1989, through May 22, 1990. Deloitte Touche is the name that appears on the eight remaining bills dated July 12, 1990 through January 2, 1992.
After examining Exhibit AA, the court concludes that the following bills of Deloitte Haskins Sells are obligations of the 12/31/89 partnership:
1/30/89 Preparation of U.S. partnership return for 1987 $1500 1/30/89 Partners' federal and state returns for 1987 $2200 3/16/89 Compilation statements for year ended 12/31/88 $2500 3/16/89 Preparation of U.S. partnership return for 1988 $1500 2/05/90 Compilation statements for 1989 $2750 4/24/90 Progress bill for U.S. partnership return 1989 $1500 7/12/90 Review of financial statements for year 1989 $4000 8/13/90 Final bill for U.S. partnership return for 1989 $2500
Total $18450
The first two bills, which relate to tax returns for 1987, are included because they were liabilities of the firm of which Beharry is presumed to have assumed his share when he joined the firm in January, 1988, and became a partner. The accounting services in preparing the 1987 tax returns were probably performed in 1988 after Beharry became a partner. He raised no objection to the two bills, which are dated January 30, 1989, until this trial. As the managing partner at that time, he probably became aware of them when they were received. The 12/31/89 firm is liable for the bills because it engaged the accounting firm to perform the accounting services involved. The court concludes that Cohen is entitled to a credit of $18,450 for paying them.
Bank Debt
In Cohen's Exhibit 30, he claims that the principal owed on the bank debt was $345,000 on the date of dissolution of the 12/31/89 partnership. In the revised accounting in his post-trial brief, Beharry claims the amount owed was $296,158. The report of the firm's accountants for 1989, plainly states that the total of the notes payable on December 31, 1989, was $342,889. (Ex. 17, p. 7) CT Page 5401 Connecticut National Bank (CNB) held three demand notes guaranteed by each partner, the first for $175,000, the second for $142,500, and the third for $17,500, a total of $335,000. An additional note for $17,899, which is related to Cavanaugh's purchase of an Audi automobile, was held by Connecticut Bank Trust Co. (CBT) and was payable in monthly installments of principal and interest. The total debt owed on the four notes was $342,899 on the date of dissolution. After dissolution of his partnership with Cohen in the 3/16/90 firm, Cavanaugh, on March 19, 1991, paid the balance of $5,510.85 owed on the CBT installment note. (Exhibit D-5) That payment reduced the total bank debt to $335,000 on March 19, 1991.
On April 2, 1992, Cohen, Cavanaugh and Beharry signed a consent and release agreement with CNB for the purpose of discharging the 1987 and 1988 notes. Pursuant to the agreement, Cohen signed a personal note for $169,700, Cavanaugh signed one for $22,500, and Beharry agreed to make a cash payment of $22,500. Both Cavanaugh and Beharry made the payments of $22,500 each as the notes provided, a total $41,500. Cohen made a cash payment of $41,500. The bank was also holding an escrow account in Cavanaugh's name in which he had deposited $41,300 as the 12/31/89 partnership's share of the fees earned on the files he had taken to Halloran Sage pursuant to the file transfer agreement with Cohen. It was agreed that the escrow account deposit of $41,300 would be applied to further reduce the debt of the 3/31/89 partnership to CNB. As a result of those payments, the debt of the firm to CNB was reduced to $211,589.
A further reduction of the CNB debt occurred on December 30, 1997, when it was decided in Fleet National Bank v. Robert B. Cohen (Docket No. CV97-0257327S, Superior Court, J. D. of New Haven at Meriden, Dunnell, J.) that the the consent and release agreement with CNB, pursuant to which Cohen had signed the personal note for $169,700 at issue in the suit, the "Cohen note", required the bank to have applied the $41,300 escrow account to reduce Cohen's obligation on that note rather than on any other indebtedness. Since Cohen was acting in a fiduciary capacity as the winding-up partner and the escrow account was a partnership asset, the 3/31/89 firm is entitled to the benefit of the court's judgment. Accordingly, the court finds that the bank debt, as a result of the decision in Fleet Bank v. Cohen, was reduced to $170,289. Although it may seem that the $41,300 escrow is being used twice to effectuate reductions in the bank debt, that result follows from the judgment in the case, which has not been challenged.
 VIII. The Court's Accounting for the Liabilities of the 12/31/89 Firm CT Page 5402
1. Accounts Payable $ 72,765 2. Add'l Expenses $ 36,380 3. Expense Adjustments $ 9,018 4. Add'l Payroll Tax $ 368 5. Bank Debt Reduced by $ 170,289 Payments and Fleet Bank Decision 6. Interest Reasonably Incurred $ 7,222. 7. Accountant Fees $ 18,450 8. Atty Fees $ __ 4,500 9. File storage Fees $ 380 10. Credit Balances to be returned to Clients $ 2,577 Unless earned
Total Liabilities $ 321,949
The court assumes that, by this time, all of the liabilities, except the credit balances, have been paid by Cohen as the winding-up partner of the 12/31/89 firm. He has an ethical obligation return to the clients involved any portion of the credit balances that has not been earned. He is ordered to do so as soon as possible and to inform the court as well Beharry and Cavanaugh when that has been accomplished. The $321,949, which includes the credit balances, is the amount that should be credited to Cohen for paying those liabilities.
 IX. Judgment and Conclusion
In Part VII, the court previously concluded that the total assets under Cohen's control as the winding up partner amounted to $806,667. Since that calculation included the $41,300 escrow as an asset and the court has treated it in Part VIII as a basis for reducing the the bank debt, the court must reduce its total of the assets by that amount to $765,367. After deducting $321,949 of liabilities paid and to be paid by Cohen, for which he is entitled to a credit, the balance remaining for distribution to the partners of the 12/31/89 firm is $443,418, which must be divided among the three partners in accordance with their interests in that partnership.
In his post-trial brief (p. 15), Cohen states that Beharry's share of the after-discovered trade payables is 22.96%, but that his share of Woolf's capital account deficit is 26.39%. On the next page (p. 16), he claims that Beharry's share of the expenses for attorney fees ($45,000) is 26.39% but maintains that his share of interest paid to 4/1/92 is 22.39%. In his exhibit 120, which purports to show the "Percent Due from each Partner" with respect to the CNB bank notes, pertaining to loans made on March 21, 1990, Cohen sets forth CT Page 5403 the "Percent Interest In Partnership" of each partner as follows: Cohen 42%; Cavanaugh 29%; Beharry 29%. None of the briefs contain any explanation of these variations. Beharry, in his reply brief (p. 17), notes the "varying percentages" attributed to his partnership interest by Cohen, but he adheres to his claim of a 23% interest in the the firm.
The most reliable evidence of the interest of each partner is the 1989 Form 1065 U.S. Partnership Return of Income, plaintiff's Exhibit 29, to which none of the parties have referred in their briefs. The four Schedule K-1 forms attached to that return, one for each partner, state the partnership interests to be as follows:
 (Before decrease or termination) (End of year) Cohen 45.83% 33.67% Cavanaugh 27.78% 22.96% Beharry 26.39% 22.96% Woolf _____% 20.41%
Woolf is not presently a party to this suit. The partnership had a claim against him, now discharged in his bankruptcy proceeding, that exceeds by far whatever share of partnership income he might have been entitled to receive. His 20.41% interest, which was created by reducing the percentages of the three remaining partners, should be allocated among them by restoring the percentages as they stood before Woolf joined the firm, as set forth in the first column above.
The result of applying the percentage interest of each remaining partner to the $443,418 surplus of assets over liabilities is that Cohen (45.83%) is entitled to $203,218.45; Cavanaugh (27.78%) is entitled to $123,181.52, less $!9,341.83, his share (27.78%) of Woolf's capital account deficit on 12/31/89 of $69,625, or a net distribution of $103,839.69; and Beharry is entitled to $117,018.01, less $47,729.04, the sum of his capital account deficit of $29,355 on 12/31/89 and his share, $18,374.04 (26.39%) of Woolf's capital account deficit of $69,625 on the same date, a subtraction that reduces his distribution share to $69,288.97 Accordingly, the court orders that judgment enter for the defendant Cavanaugh to recover $103,897.41 of the plaintiff Cohen and for the defendant Beharry to recover $69,288.97 of the plaintiff Cohen.
___________________ David M. Shea, State Judge Referee